Good morning your honors, my name is Barry Kessler and I'm the attorney for Prolix Packaging in this appeal and my co-counsel today with me is Mr. Lawrence Becker Thank you, are we ready to proceed? Yes your honor, if it please the court as I said I represent Mr. Barry K. who is the plaintiff below Just briefly, this should have been the perfect marriage, the marriage between Mr. K. and Prolix Packaging in business Mr. K. was one of the top salesmen, most iconic figures in the paper products industry from 1958 approximately to about 1998 just before he joined Prolix, he had millions of dollars in sales revenues every year during that period his main clients were Juul, food stores, Walgreens, drug stores, Wiseway and many others he no longer really could or wanted to run his own business, he was looking for a business like his that would enable him to service and sell to his main customers and have others within his new employment help him with all of the other customers that he was going to bring with him For Prolix it was also a perfect match, they were a young up and coming company, they were successful, they had good facilities, lots of sales people but they were mostly still a small kind of company, Mr. K. would double their sales revenues if he brought all his customers with him and provide a kind of a luster that they didn't have, they would be able to say now in the business community that Juul and Walgreens and companies like that were clients of theirs they entered into an employment agreement, a written employment agreement by which Mr. K. was to be paid for a period of five years commissions on all sales made at Prolix to Mr. K.'s previous customers that he was going to bring with him from his prior business He did work there, he began to work there, everything went fine except for one thing, Prolix were nagged on part of the contract they refused to pay Mr. K. for sales made by their sales people to the customers that he brought with him And he let that slide all the way to the end? He did not let it slide, the testimony is clear Your Honor that about three months into his employment he said why am I not being paid on all of my former customers when the sales are made by your sales people Ms. Jakubowski who is the CEO of the company said she'd look into it, she came back and said we're not paying that's all there was to it, it was the clear testimony and it was unopposed, he didn't agree to it he didn't think it was correct and proper but he felt he had no other choice they simply refused to pay him on those sales and at the end of his employment he sued for those lost commissions over that period of time and the result of the trial which lasted several days over several months because of limited court time in front of Judge Barkowitz Judge Barkowitz entered a ruling in his favor in part in the amount of $373,000 plus in lost commissions Do you know how he calculated that? Yes, he calculated it, he took the total sales that we could prove through documentary evidence business records that we luckily got from another company that were not produced by Prolix to us and he basically multiplied, he took our chart that he asked for which was to multiply those sales by 7% All sales? I'm sorry All sales? All sales made by Prolix sales people to former Kay customers it did not include sales made by Mr. Kay personally to his former customers, those he was paid on most importantly it did not include 34 of the 60 months that Mr. Kay worked for Prolix he only allowed us to prove damages, didn't even let us enter into evidence the damages, estimated damages for the other 34 months that he was there What exhibit is that? I'm sorry What exhibit is that? I don't recall the exhibit number but I think it might be 13 if I'm correct it's exhibit 13 which contains our estimated sales for the missing years now we did respond after the judge's March or January ruling I believe when he said I want you to compute for me what the number should be at 7% and at his request we did that and so that's also part of the court record so it was the sales that he let us put into evidence times a 7% commission rate based on the sales for 26 months made by Prolix sales people to Mr. Kay's customers Didn't you say to the court that the case is only about the customer list in Prolix's sales to his customers in which he was only to get 2% because he didn't make those sales We did say that your honor So where did 7% come from? It's a very unusual situation in the 45 years I've been practicing law around here it's the first time I've ever seen something quite like this You've got a gift horse here and I don't blame you for taking the right but how do you reconcile that? I don't think we got a gift horse we did say 2% however the testimony from Ms. Jakubowski, the CEO of the company is just as compelling and just as sincerely held and just as frequently stated at the trial that the commission rate on all sales to former Kay customers was supposed to be 7% and the judge, seeing that odd dispute, decided as a matter of law and I think correctly, that the correct commission rate was 7% I think when you look at his logic in which he focuses on recitals recital number 5, which clearly calls for a 7% commission for sales derived from employee now they could have said 7% on sales specifically made by the employee he didn't say that the recital says sales, a vague thing sales derived by employee which suggests to me that that recital meant all sales that had anything to do with Mr. Kay and his customers and that blends very well if you look at 7A and 7B of the employment agreement because 7A says Mr. Kay is supposed to get a 5% rate of commission that's his basic rate of sales commission and then in 7B it says however he's supposed to get an additional 2% for sales made to his customers 7% as I understood what Ms. Jakubowski said was, her response was, well rather than the 5 and 2 her position was, we'll just give you the 7 and we don't have to worry if that's why she wasn't going to pay the 2 and even, I believe it's you who said your honor, we're not complaining about Barry's direct sales the fifth recital refers to Barry's direct sales the sales he makes himself in which he gets 5% plus 2% we're not complaining about that in this case so again, you weren't complaining about the 5% no and I understood her testimony she just said they conflated the 5 and the 2 and that was her defense as to saying why they didn't owe the extra 2 no the defendant's brief says that's what she said but that is not what she said she never said anything about that she said, 7% in my opinion was the rate of commissions that Mr. Kay was supposed to get on all sales to his customers her testimony was that the biggest dispute was who are her customers yes, they say that in their brief but there isn't a citation to testimony that says your quote she said 7% is what he's supposed to be paid on all commissions at all sales that's the way I want it to be I don't want to have to fool around with 2% for here, 7% for here, 5% for here I want 7% on all sales this is an issue of law I think it's a tough one I grant you that it's very difficult I think Judge Barkowitz though, in the end he heard everybody, you know, 2 is it an issue of law? it's an issue of law credibility of the witnesses? no, it's an issue basically of law, but what's the legal question? I'm sorry what's the legal question? there's an ambiguity in the contract and the judge is determining did he ever declare an ambiguity? I don't think he specifically said it was an ambiguity, your honor but to me that's the way he ruled on it he was trying to determine the meaning of the contract does it mean 2% or does it mean 7% for these particular sales and he said 7% but my opinion as an attorney is that it's an ambiguity and it's a rule of law except that he did hear what people said he did hear Mr. Kaye say he thought this was an incredibly valuable company and list that he was bringing to them he did hear Ms. Jakubowski say yes we wanted to acquire this business and for good reason but I think I'm not questioning what you interpret what she said but Ms. Jakubowski testified and I'm quoting one third because it was too much of an accounting difficulty that's why she took the 5 and the 2 and then she said we just lumped it together now that's different than what you just said and that's what I was saying that the testimony that I read what the defendant is saying is they paid you everything you were owed because they added the 5 and the 2 and they just figured that was it they overpaid on that and felt that they had given you what was sorry now you may disagree with that but that doesn't say she never testified that you wrote 7% on everything she did if you what she said was 5 plus 2 it was too difficult for the accounting we lumped them together I think if you look at the citation I'm sorry I think if you look at the citation in my brief as to her testimony her testimony is very clear that the proper rate of commission was 7% I only ask I can't come up with it right here in this moment but I think if you I could be wrong your honor but I believe very strongly that if you look at the testimony her testimony that I cite in my opening brief on this issue she says 7% was the correct rate I think she was sort of fluctuating in her testimony there's truth to that right so Judge Berkowitz would be within his discretion to weigh the testimony and decide based upon the differences in testimony I'm going to go with this notion yes to some extent and also he he mentioned in his ruling a behavior by Prolix in paying 7% and he felt that that substantiated his his reading of the document of the employment agreement did anybody argue before him during the course of this long litigation that the agreement was ambiguous was there ever any ambiguity Judge Pierce I don't remember the exact words of course but there was there were many arguments about what the proper rate of commission was in front of the judge both during the trial and at earlier stages of the trial of the litigation as I recall there were times when the other when the defendant said we weren't entitled to anything there were times when they supported lawyers comments whether we were to get 2% etc. it went all over the map and I think in the end there's some issue of fact that should not be overturned but I think it's largely an issue of law so I think it's a little of both but I think the judge reached in either case the judge reached in the end the right decision I think it's the way that best explains this contract if you look at the recital 5 and paragraph 7a and b I think this is what what the individuals who signed this agreement wanted it's 7% in everything 7% in everything yes if I may go on I was going to take a minute or two to deal with the issue of no meeting of the minds I think that's I'll skip over that I think it's without merit the cases cited are oral agreements this was a written agreement the meeting of the minds is found in the written agreement jointly executed jointly signed off on jointly drafted etc. the other issue that's raised as to the contract is what was exhibit A exhibit A is mentioned many times in the contract it always says refers to the customers listed on exhibit A which strongly suggests that an exhibit already existed and was to determine which customers Mr. K would be paid commissions on the overwhelming testimony was that exhibit A which is by the way essentially this was the customer master listing from Mr. K's former business there were no other lists ever that list was at the closing that list was provided to it's a question of fact and it overwhelmingly supports our position on that certainly shouldn't be overturned so it was a credibility question and Mr. K's testimony was credible yes your honor I just think the evidence was overwhelming the facts were overwhelming it wasn't even just credibility I think it was more than that having made in my judgment all the right decisions about the contract that there was one that exhibit A was the customer master list and that the appropriate rate of commission was 7% the judge in my opinion went on to make two serious mistakes and errors of law the first one was that he did not he allowed us to make an offer of proof but he did not allow us to put into evidence the best evidence that we had available this is not a best evidence case but the best evidence that we had available which was Mr. K's testimony about the 34 months for which we did not have documents now there's a lot of talk in both of our briefs about documents that were there documents that were strewn on the floor documents that existed but were not produced by prolecs and I think the testimony is pretty strong that there were documents that should have been produced at once but the judge does not pay any attention to that issue in his ruling what he says is there were no documents available to either party for those years and I think that's if not literally true it's in essence factually true then what he does I thought what the judge said was the documents the raw documents are in that warehouse you did not avail yourself to look through all that it was a lot of material and in a cold warehouse as you said that it was available to you therefore you can't complain what the judge specifically said was the only hard number for former K customers listed in the exhibit I have for the years 2002 and 2003 he gets the years wrong here but he goes on and says for the year 2002 sales figures for the remaining years were not available to either party there should be no sanction on either side he says and then he goes on to say the reason that he's not going to allow the testimony has nothing to do with that and it shouldn't even if there were 100,000 pieces of paper strewn on the ground that does not mean that we should not be able to put into evidence credible testimony and the judge does not talk at all about the issue of there being any documents on the floor from his point of view there were no documents and even if there were I think you're using a loose term what are you talking about the records of the hundred thousand pieces I'm sorry your honor you're saying there was no warehouse that they had a there was a warehouse and they had documents there it had sales slips and you could go through the sales slips one could that is documents what documents are you talking about you're apparently talking about something else and I think the judge is saying there weren't any summaries like the one found in a bunzel that's what the judge is referring to you've got to be real careful here like Jeff Grabowski's testimony what we're talking about and I think the judge absolutely talked about the fact that the documents raw documents were available and he didn't avail himself of them and you're talking about the summary so let's make sure we know what you're talking about in the middle of the trial he talked about it there was a lot of discussion about the documents the pieces of paper that were on the floor in the cold warehouse which we had the opportunity to look at but we did not have the economic ability to audit and that was in our testimony but in his ruling what he says is sales figures were not available to either party and sales figures meaning the summary well maybe that's what he means those were sales figures we don't know what he means the slips of paper on the floor were sales figures maybe he didn't mean that I can't be sure so if we don't know what he means then we have to affirm well I'm not sure exactly what that means either we can't second guess him if we don't know what he meant well I think the words are obvious there were no sales figures available to either party so I think what he was saying is there was nothing worthwhile that we could look at that could have helped us I think that's what he means but let's say he didn't let's say for the moment that we could have looked at those documents and could have done something with them if we talk about that then I have to get into the issue of the documents that were not produced to us the sales figures that were not produced to us and the testimony is clear Mrs. Jakubowski says they were there they were in her file cabinets they were in her warm office except that Mr. Kaye says that they were not shown to him or me at that time and that's clear and uncontradicted nobody ever showed us the sales figures in the summary forms and we know they were produced because Bunzel had some of them and they were never given to us Why didn't you bring all this up before trial? I'm sorry? Why didn't you bring all this up before trial? Why didn't you do a motion to compel if you were so sure that They told us because they told us those were the only documents Well, apparently so We assumed that, we asked for everything this is what they said they had and this is what they gave us and that's why we subpoenaed and didn't get them that way either documents from Bunzel and other places we just got lucky that an officer at Bunzel had them for his own safe keeping those two years that's the only way we got them and it happened that Mr. Kaye worked there and was talking to him and said, yeah, I got those two years that's the only way we got those it was sleight of hand, that's the reason we didn't get them Did he say that was there any testimony that Bunzel had them for all the years? I don't remember if there was testimony but I can tell you the truth is they only had them for the last two years they didn't care about them That's right, so why do you assume then that they existed for the prior because she said so because she said in her testimony your honor that they were in the warm office in the file cabinets but that she wasn't there when we got there and Mr. Kaye testifies as clear as a bell that all we were ever showed he and I were the records strewn on the floor in the warehouse but in the end I don't think it matters, I really don't we don't have to use those pieces of paper that are strewn in the warehouse, Mr. Kaye's testimony was not speculative he knew more about this than anybody in the world with the possible exception of Eva Jakabowski this wasn't speculative we weren't looking, he wasn't talking about what's going to happen five years from now and speculating on future profits and future sales he knew the sales, he testified he knew what the sales were in 1998 in part of 2000 and we definitely knew what they were in 2002 and 3 because we had the documents for that the summary documents that showed the sales figures what happened from 2000 to 2002 did all these people just go away and then come back in 2002 of course not, Mr. Kaye was there he was selling his ass off pardon my language and he didn't get the commissions for all those sales, how's that fair 34 months and he testified that as to his own customers he knew exactly in those missing years once he sold directly he knew from being there every day essentially what was happening with the customers that were being serviced by Prolix they didn't just go away the number of shopping bags that a grocery store needs from year to year and month to month doesn't change very much we had specific records for 2002 and 2003 and 1998 and a little bit of 2000 the rest of it was Barry Kaye saying in the end, based on all my knowledge, all the customers that I talked to, everything I see talking to Eva Jakabowski knowing that their overall sales were going up a bit and his testimony was the sales for all of those customers serviced by Prolix were and had to be about the same as they were in the years that we knew about they were surrounded those years those companies didn't go away he didn't sell to them Prolix didn't sell to them in 2000 and in 2002 and 2003 but not in 2001 so in the end what we get is a horrible miscarriage of justice 34 months where he worked there and if the judge was right in his other rulings, we lost about $400,000 in commissions and Prolix gets a $400,000 windfall, we know he was there we know he sold we know how much essentially what his sales were to the customers that he sold to so this testimony was not speculative sure it would have been nice if we had the summary computer printouts that Prolix didn't give to us, that would have made it a lot easier but they didn't and I don't think that we're limited, I don't see any reason why we had to even if we could which Mr. Kay testified and nobody objected to it that it was too costly to organize all those slips of paper related to nothing sitting on the warehouse floor we didn't have to use them what would you use? his testimony it was very credible nobody in the world knew more about this than he in fact I don't think even Jacobowski knew as much about this as he did, these were his customers, but they were sales not by him, the sales we're talking about were sales by Prolix sales people to Barry's former customers, Barry Kay's former that's absolutely right, but he had contact with a lot of them, there's just so many hours in the day that's why he went to Prolix because they had more sales people that could handle all of his other customers, the previously other salesmen who worked for him went to so, look he should get something for those 34 months he should not be prohibited from giving credible testimony average testimony the exhibit shows averages was there anything in the record that showed that these customers were subpoenaed for their records of purchases? some of them were I don't know if it's in the record but those records weren't presented at trial? they were not all I'm saying is there are alternatives if you don't want to go through the warehouse there apparently may have been alternatives to do it for these customers would have cost enormous amounts of money we went to one or two and we had a lot of trouble even getting old don't forget this case even in discovery was only rolling in about 2007 8, 9 and by that time most of these companies would write them a letter and they would say we don't have them anymore so in fact in reality the answer is no, there were no such documents that we could have presented and in any case this is good testimony this isn't a best evidence case your honor we're not trying to prove what a document says or what a document looks like this is very good testimony knowledgeable testimony it's completely unfair that Mr. Kay should not get the commissions that were withheld from him on these customers for two and a half, two and three quarters years well there's one other issue if I might, the wage payment act, I think the judge made a significant error there also we originally before trial asked to amend our complaint to include the sales act it was a mistake actually and at the end of the trial it became clear that the correct applicable act was the wage act the difference as you probably know is the wage act applies to employees the sales act to independent contractors we asked to amend to the wage act the legislature has a very strong policy here, they don't want companies withholding employees wages for no good reason you sought to amend it after the judge had ruled on the liability he brought it after the trial but before his final ruling but he had already ruled on liability he had isn't it true that he would have had to reopen the proofs? absolutely not, everybody agreed that Mr. Kay was an employee the defendant even argued when there was discussion under the sales act and said of course he's an employee your purpose was to get attorney's fees attorney's fees and the penalties in both the 74 and 2011 act the 2011 act merely amends the 1974 act it prohibits the same behavior that is withholding employees or independent contractors wages or commissions or whatever after they've left the company and the legislature is pretty serious about that this would have been for conduct that happened seven years earlier? yes so the law was the act was amended seven years after the fact to provide for attorney's fees? that's correct so you wanted that law applied retroactively to what took place seven years earlier? that's correct Judge Pierce I think if you look at the board of education case and the cases they cite that the correct ruling here is that the 2011 amendment should apply retroactively the legislature changed nothing about the behavior the behavior that was outlawed was still the same don't withhold employees wages but you didn't bring a claim under the wage act you waited until after what was the reason to wait? if it's the same he's an employee we made a mistake when we asked to amend the sales act before trial we made a mistake the proof was clear at trial and the judge made it clear to us also that if any act applied it was the wage act but he also said that he'd have to reopen the proofs he said that but it's not true your honor it's just not true there was no proof that needed to be put in it was in there that we're an employee if you ask defendant's counsel he'll agree that we were an employee and that if any act applied it was the wage act and the cases we've cited cases in our brief that are very clear in saying that we should be allowed to amend the complaint to conform to the proofs even sometimes when there's a little bit of prejudice under the cases I'm willing to say when there's no prejudice it's clear that we should be allowed to amend to comport with the law and the proofs in the case whether it's the 2011 act or the 1974 act fairly close case I think that the 2011 act should apply giving us attorney's fees and 2% a month but if this court decides that that's not proper we should at least be able to obtain the penalties under the 1974 act which did not provide for attorney's fees but did provide for a 1% penalty per day up to twice the amount of wages that were withheld and that that rate starts within 15 days of the court order we think one of those acts should certainly apply it's a in my term a punitive provision that is supposed to put the employer on notice that you can't treat your employees unfairly and there's a price to be paid if you do that so be careful treat them fairly and pay them where's where's the sense of fair play here to 7 years after the fact tell the employer that oh by the way even though it wasn't in effect 7 years ago we're now going to apply that 1% penalty it was your honor the bad behavior that's prescribed by the legislature was prohibited in 1974 was that limited to what twice the wages yes 1% a day until it gets to twice the wages withheld they knew this or maybe they didn't know it but the law was there now it's been amended to 2% per month plus attorney's fees I think the statute says reasonable attorney's fees 2% per month is forever and there's a good public policy reason because most of the time it's difficult for the employee to sue for what's been withheld because of the amounts involved was he an employee W2 employee? yes and the evidence is clear on that and it's undenied unopposed the two cases cited in the board of education case I think it's county board of education versus state board of education I believe it's cited first on page 37 of the defendant's brief I'm sorry the act itself doesn't speak it does not and I recognize your honor that prospective is favored unless there's something specific in the act that otherwise says so but the case law says that in my opinion though it's a close question the case law says that in cases like this where the behavior is not amended so it's not like an ex post facto law but the only thing that's amended is the remedy for the disapproved behavior that it's reasonable to apply such changes in the remedies retroactively in this case that would mean attorney's fees and 2% per month but if not the 74 act existed the problem is the difference here is that if you had brought a claim under the 74 act prior to threat and then the question would be do you get the retroactivity with regard to the attorney but that's not our case our case here is you didn't bring any claim before trial after the trial after the liability ruling then you're asking to bring a claim as you said and I'm not sure as I recall if there was any reason that you gave in the motion to add the wage claim for your failure if you haven't done it previously well I didn't no I didn't say I made a mistake I didn't say I made a mistake though I did but we can't I understand I know but I don't think your honor that it matters the amendment conformed to the proofs that we requested under the wage act and required no new evidence the evidence was in there it did not in spite of what the judge said it did not require any reopening of the proof my client was an employee he was always an employee for the 5 years he worked there the defendants agree with that that he was an employee and therefore the proof is there it's part of the trial and it's unopposed there's no need to open up anything and the wage act therefore as opposed to the sales act applies and one if I'm certain I'm sorry again your honor had you brought the claim 7 years earlier the employer may have been advised by its attorney that by the way you have this counter that provides for a statutory penalty that if you lose it would be substantial perhaps look we could have there's no question that had we moved to amend I shouldn't say there's no question but probably not much question that if some earlier time we'd have moved to amend under the wage act but maybe 6 years after we started the litigation that it would have been allowed and besides that I don't think this is something to take into account the lawyers on the other side are very competent smart attorneys and well I missed it probably they didn't at least there was something out there that could escalate the cost of this case to them that's the law thank you very much good morning your honors first of all I want to apologize to the court and to counsel because I did note there was an inaccuracy in the brief that we filed to the court I believe on part 3 page 29 of my original filing we stated that at no time did Mr. Kaye ever complain about the non-payment of the 2% commission in fact when I went back and reviewed the in fact he did have the one complaint I believe it was sometime about 3 months after and he sent a letter as to that effect so I apologize to the court and to counsel for that inaccuracy in my brief that being said I think the first thing we need to do is step back a little bit because I think there are really 2 issues before the court today that are critical issues one is there in fact a contract between the parties as to this overwrite payment and then 2 what are the terms of that contract but we have to put that in the context of what was happening and if we look at the briefs that the plaintiff has filed on this matter as well as his statements before the court when he was just here a few minutes ago he was talking about this being the perfect marriage between between Mr. Kaye and Perlix and he was bringing a lot of business to the table and this was going to be a wonderful arrangement and what counsel neglected to tell the court and is nowhere to be found in his brief but at the time of the acquisition Mr. Kaye's prior business was bankrupt he had operated a company called the Kaye Group Inc that company was in substantial debt it was already losing customers to Perlix so they were already getting his business he went ahead and performed... That has nothing to do with the issue No but it sets the So your argument has to do with whether there is an agreement or not? That's correct your honor. Why wasn't there an agreement? They were paying them to the agreement? They paid them every month? The question is as to the 2% override. There's no question that he was going to be paid a commission on the sales that he performed. That's not disputed. Are you conceding that he gets 7% on everything? No, not on an override, no. So he should have received 5% on what Jack Kowalski testified she paid 7%. She overpaid. Is that right? She lumped everything together and made a lump sum 7% payment. On his sales. On his sales. Right. When she should have your position I would assume would be his sales should have been 5% and 2% on her sales. Well that's the confusion I think that's in the record. You've got his sales after the assignment for benefit of creditors to customers that he was servicing. That's 5%. If those customers were part of the customers that he brought to the table, that he was currently serving at the time that his business went under, then he got a 2% override as to those customers. That is laid out very clearly in paragraph 7A and 7B. It's not just the customers that were on exhibit A. He's servicing customers on a going forward basis after this transaction. As to the customers that he's personally serving he's going to get the 5%. If those customers were customers that were theoretically to have been listed on exhibit A, customers that he brought to the business and that he brought over with him, then he would get the 2% on top of that. I think what the testimony of Mrs. Jack Kowalski was, it was all too confusing, so she paid him 7%. She didn't follow the agreement. She did not follow the agreement. I'm going to try to understand again. Under the agreement, say she's followed the agreement. Under the agreement, tell me if I'm right or wrong. Under the agreement, if they were going to follow that, if he serviced the customer and it was a customer he brought, he got 5%. If he serviced a customer that he brought, it was 7%. If they serviced the customer he brought, then he gets 2%. In either case, it's customers he brought. No, it's not either case customers because some customers after he got there were Prolix customers that he's now servicing. He's going to be paid a 5% commission on Prolix customers that he was servicing after the assignment for benefit of creditors. That's where some of the confusion arises here. It's not that he's servicing all his old customers, but now we're getting into pretty... I don't have the benefit of being trial counsel here. I'm merely the appellate counsel. I'm stuck with reviewing the record just as your honors are. I have to look at what's in there. That's what we're trying to figure out. What's going on here, though, is we've got a transaction where his business is sold as an assignment for benefit of creditors, and when everybody is sitting at the table on this transaction, the question is, is there an Exhibit A that's agreed upon, and who will be the customers that are identified on Exhibit A? That's where the confusion arises, and that's why I was giving the background, your honor. Let's assume, for sake of an argument, that the issue here was what was Exhibit A? Was there an Exhibit A at that point? The first question is, is there an agreement as to what's going to be on Exhibit A? Because Plaintiff's arguing that it's every customer he ever serviced. But that was a factual finding by the court. The issue was, was there an Exhibit A? And apparently, according to the record, the case is this, and the defendant said it was this. Something different? Yeah, but our view is that's not the issue. The issue is, was there ever a meeting of the minds as to what customers were going to be on Exhibit A? That was the ambiguity, and that's why the judge, because there was nothing marked Exhibit A, so the judge had to have a factual trial, was to find out what the facts were, and he believed Mr. K, and he didn't believe your client. The question is, who was to be on Exhibit A? And the judge... And that's not a fact question. That's a question of whether there was a meeting of the minds. No, there was an ambiguity of whether Exhibit A was in existence at the closing, and he found that Exhibit A was what Mr. K testified. He said, and I quote, until today, I don't believe there's any evidence that conclusively establishes what Exhibit A was, at or about the time in which the contract was entered into. That's his direct quote. Right, but then he goes on and... He felt constrained to come up with something because he felt it was important, and we believe that's the essence of the error. This is a case of where, after an assignment for benefit of creditors, you've got a lot of documents sitting in the room when this closing's occurring. You've got all the loan agreement documents between American National Bank and Mr. K, because he was personally guaranteed for $400,000 of funds to American National, he didn't have those money to pay. So he's selling his business to Prolix in order to get the money to pay off American National. So you've got lawyers all over this room with documents all over this room, and now one of these documents is also the employment agreement going forward. So the question is going to be, as you're sitting there, on what customers are we including on this document? If you read his order, he's saying there was no Exhibit A attached to the agreement. Mr. K says it's Exhibit 3. Ms. Jakubowski says it's Exhibit 27. Okay? And I find, after listening to all this dispute, I find it's Mr. K's Exhibit 3 is Exhibit A. So, rightly or wrongly, that's what the judge decided as the basis for determining this is Exhibit A. It wasn't marked, it wasn't attached, but based on the testimony of the parties, it's not 27, it's plaintiff's Exhibit 3. That's a fact question. And you're saying he shouldn't have done that, that there was never an Exhibit A? I'm saying there was never a meeting of the minds, before you even get to the fact question, as to who was going to be the customers on Exhibit A. Is it every customer that Mr. K ever served for the last 40 years? And I think Judge Hartowitz, after listening to the testimony, decided that you're wrong, that this is Exhibit A is really what's contained in Mr. K's Exhibit 3. So that's what Exhibit 3 is. It's Mr. K's Exhibit... Exhibit A is Mr. K's Exhibit 3. So he made that determination of, based on the evidence, that's what I'm saying is Exhibit A. Then he moves on. My only point, Your Honor, is that, I believe, is the essence of the error here. He should have made a determination as to what the 2% override was going to be paid on. Is it every customer that the K group served for 40 years, even though they're no longer servicing those customers, and even though in the last six months before the assignment for benefit of creditors, some of those customers had already shifted over to Prolix, and that's what Ms. Jakubowski is testifying to. She's saying, wait a minute. Why are we signing an agreement with a bankrupt that we're going to pay him a commission on those customers we already have? They have left his company, and they've already joined our company. Whereas, on the other hand, Mr. K, and even in paragraph 8 of his complaint, is stating, I should be paid an override on everyone that I ever served for the last 40 years. Your counsel, when he got up here, he said that that business had been going since 1958, and in 1998 it was closing out. So you're talking a 40-year business that he had a lot of customers. You've got a fundamental disagreement between the parties, which is clear in the record, as to who were to be the customers on Exhibit A. And isn't that something to be resolved by the court? No. It's not up to the court to create... Because there's a fundamental difference, and I'm listening to all this testimony. At the conclusion of all this testimony, the trial court is supposed to say, I punt. I'm not going to decide, because you two don't agree, or can't agree on Exhibit A. The trial court does not have the right to create contract terms that are material terms where those terms do not exist. So, to answer your question and to be very blunt, yes, the judge should have punted. He should have said, look, we have a fundamental disagreement here as to who should be on Exhibit A. You think it's 40 years of customers, and you're saying that it's only the ones that were brought at the time of the closing. I find no evidence to establish what Exhibit A was, and as a result, it was the failure of you two parties when you sat down at this table to enter into an agreement. There are lots of cases of where companies sit down to finalize their transaction, and because of the dispute as to some term, everybody gets up from the table and walks away. It's incumbent on those parties and the attorneys to either finalize that agreement and attach the correct documentation, or to walk away and say, we've got to come back another day. But you don't walk away from a table in a sophisticated assignment for benefit of creditors in a five-year employment agreement that's going to provide for a 2% override. You don't get up and walk away from that table when you have no agreement on the exhibit and walk out of the room. But the conduct of the parties subsequent to walking away from that table was that she was paying him money for certain transactions. The conduct evidenced that there was a main dispute commencing with the date that the contract started performance. She didn't pay the money. He sent a letter three months later saying, I'm not getting my money, and she's saying, you're not entitled to anything else. It was too difficult to determine, and she was paying the 7%. She was getting 7% on those customers he was servicing, which is different from the override customers. He was paid the issue is not the 7% that he was already paid, is what you're saying. That's not the issue. The issue is those customers that were serviced by Crowley. He's saying, whether it's 2% or 7%, under the agreement, you could read that as saying that he gets a 2% on customers that are being serviced by Crowley. That's part one, but it's more than that because his counsel admitted at the trial and the plaintiff admitted at the trial that he was only entitled to 2%, so the record is replete with judicial admissions that he's only entitled to 2% on the override customers. You're saying, wait a minute, we don't know who the override customers are. I'm saying there was no agreement, no meeting of the minds. There was a meeting of the minds that there would be a list. Yes. Everybody left the table without an agreement. A few months after he starts, he writes a letter saying, I'm not getting my 2% and there's a disagreement about that, but he brings it up and then he waits until the end and then he files a lawsuit. On the 2%. On the 2%, but it's not just the end. He brought it to make sure that the record's complete. He waited to bring the lawsuit until after Prolix was sold. The Jakabowski's no longer had any control over the computer systems, the software that creates these reports that counsel says he's seeking. All that was sold to Bunzel. The only thing that the plaintiffs have left, or excuse me, that the Prolix has left is this warehouse of the actual individual records that Bunzel doesn't care about. Did Jakabowski have in her office, as counsel stated, copies of summaries? There's no testimony in the record that in the ordinary course of business that summaries were prepared. The only testimony in the record is that there were some summaries that had surfaced and those were received through a document production request to the buyer Bunzel. There's nothing in the record that says that the seller, the Prolix, had summaries or ever created them in the ordinary course of business. And importantly, when this issue arose at the outset, an order was entered, which is part of the record, at the trial level, that the parties would mutually share the cost of going back through the records, the warehouse of records, and recreating these things, and recreating summaries. And the plaintiffs determined not to do that. So not only is it a matter that they could have subpoenaed records if they hadn't waited seven years to do it from Bunzel, because I can't imagine, but I don't know, if Bunzel would have destroyed all the computer records within six months after buying the company. So we don't know one way or the other what the plaintiff did in terms of discovery, but all that information was with Bunzel. The only thing that defendants retained, according to the record, were the individual daily sales reports. Those were kept in the same method that they were kept in the ordinary course of business, and a court order was entered that the parties could share the cost to recreate that. So plaintiffs had every opportunity to come up with a precise number. They just didn't want to do it. So they didn't. But I want to get back to the first issue was whether there's a meeting of the minds, and I think we've talked about that. So now the second question is, assuming that you agree with Judge Barkowitz that there is a meeting of the minds, and this is the proper Exhibit A, the next question is, what are the terms of the contract to be decided as a matter of law, and how much money should be paid? That's where I've previously stated to Your Honors that there are judicial admissions replete throughout the record that they're only entitled to 2% of the override. And how do we calculate? Do we have to send that back for him to calculate? No. Okay. And the basis for that is what you stated? We can take the exhibits that are already here. I even showed the calculation in my brief as to what... Exhibit 13. I'd have to look at the number. I think the number comes out to $106,000, the 2% of the actual damages that they showed. So if you multiply that by the 2% override, it's $106,000. It's not the $380-some-thousand. $380-some-thousand. $300 is 7% of the override, rather than 2%. Right. That can be determined right now without remanding the case or doing anything. This Court can look and apply the 2% and say we find that it's a 2% override, multiply it out, you owe $106,000. That can be done without any remand. And then as far as the years in which Mr. K did not present any document evidence that he apparently testified to what he thought the damages were, your position is that he should get nothing for those years. He has the duty to put on evidence as to what his damages are with some precision. If Prolix prevented that, I mean, I understand the law. All of you know the law. If we prevented that in some fashion through either a destruction of records or a failure to turn them over in bad faith, then clearly he can get into some projections as to what those damages are. I mean, the law is very clear here. That's not what happened here. I mean, Prolix sold their business to Bunzel, and they sold him everything, and those records go with the sale. I don't know the reason counsel sat on this matter for year after year after year before sending over a document production request in a motion to compel Bunzel to turn it over or even to go get copies of the computer records and ask for some kind of backup of the computers. I mean, that information was transferred, and it had nothing to do with any actions of Prolix. Plaintiff didn't file his suit in this case until after the sale. So he had an opportunity for the five years that this contract was ongoing to come up and say, wait a minute, I should be getting this money, and I'm going to go ahead and file my action now because I'm entitled to this on an ongoing basis. He didn't do that. He had a good deal with the plaintiff, their business was sold, and only then did he bring his action. And I believe that the affirmative defenses should kick in at that point because that's latches. You can't wait until the business is sold, the records are gone, and the defendants have no way now of reconstructing all this, and only then, after five years, filing your action to seek to recover your commission. What about waiting until after the judge rules on liability to seek an amendment to add the wage? Well, number one, counsel has misconstrued the Board of Education case because the Board of Education case is very clear, and in that case they did not allow a retroactive application of the statute. What the Board of Education stands for is, number one, did the defendant have notice that it could be liable for attorney's fees if it didn't prevail in the ultimate litigation? And in this case, clearly, defendants had no knowledge that they could be liable for attorney's fees because under any of the allegations in the complaint that had been filed by the plaintiffs, there was no grounds to recover attorney's fees. So when the statute was amended, effective January 1st of 2011, that was the very first time that the defendant could be liable for fees, and that was over seven years after the sale of the business and the closeout of everything. So, number one, the Board of Ed makes clear that that's the first point you look at. And secondly, the Board of Education case is clear that when a new law is enacted, the court has to ask, did the defendant have the opportunity to avoid its effect? And if the defendant didn't have the opportunity to avoid the effect, then you don't stick them with a retroactive application of that statute, and that's what happened in the Board of Ed case. So counsel's construction of the Board of Education, respectfully, Your Honor, is completely incorrect. Basically, if he had sought to amend previously, then he might have been able to do that. But now we get into wonderful conjecture, because I'm the trial record counsel. This is like now an offer of judgment over a United States district court. Now I go back to my client and say, guess what? There's a cause of action here that you could be liable for legal fees. I don't care whether you think you're liable or not. We have to get this over right now in order to minimize the damage. Okay? So I mean, now you've put facts on the table which change how an attorney... You'd completely change how you're going to approach this case if I'm legal counsel. So I don't think it's fair to turn around four days after the effective date of the statute and say, gee, guess what? Now we're going to come in for legal fees. How would you address counsel's statement that it also applies to the 2% penalty? I think you've got to give some kind of notice in your pleadings at some point as to what relief you're seeking. You can't wait until the contract has ended. So he waited five years before he even filed the lawsuit. Then he turns around and waits another seven years before he actually amends his complaint, or attempts to amend his complaint to state the cause of action. I just don't think he'd do that. That's tremendous prejudice to the other side. I don't think that's fair. What about the proof? The only thing he has to prove is whether he's an employee or not, and then he gets paid. He minimally has to prove he's an employee, but I don't know. There may be some bad faith issues involved as well. I think there could be a host of questions if you look at the statute. I don't, as I'm standing here right now, I haven't looked at the statute in terms of what you have to prove in order to fall within that, in order to get a penalty. So I'm not, I can't address the court with that. But I'm not sure it's so simple as to just say, you know, it's like prango. It's all in there. You know, judge, just root through the record. You can find it. You don't have to have an additional hearing. I mean, I'm not prepared to make a statement one way or the other at this point. If you're looking at the contract, you know, past the issue of meeting of the minds, and now we're looking at the contract and trying to decide what it provides. I'm not certain that anyone laid out to the court one way or the other whether the, whether the pass clause was ambiguous in connection with construction of the specific provisions in 7A and 7B. But I do know this, that Illinois law is clear that there is a rule of construction where you have a generic provision in a contract and you have a specific provision in the contract that in that case, the specific provision always controls over the generic provision, always. That rule of construction minimally should have been applied by Judge Barkowitz, especially given the confusion that's in this record. And looking at the whereas clause that talks about generic payments, and then you get to the very specific section 7A and 7B, which clarifies that for everything that Mr. K sells, the work that he does himself, he gets his 5%. And for everything that's off an Exhibit A customer that other prolix people sell, he gets his 2%. That is very specific. And I believe under proper rules of construction, without regard to anything else, you've got a rule that he is only entitled to the 2% if you're going to find that the Exhibit A is part of that contract. And the final sentence I comment with respect to construction of the contract is I believe there's another rule of construction that's very well known, that if you're going to construe a contract, you have to do it in such a fashion that you don't render some of the provisions in that contract meaningless. By Judge Barkowitz's ruling that it's going to be a flat 7%, even on every customer listed on Exhibit A, in effect, that ruling rendered Section 7B completely meaningless, because it served no other purpose. He's getting a flat 7%, so I don't know where he's coming up with any 2%. So what I understand, Mr. Mora's argument is, well, it's too difficult. I mean, Jacob Bielsky testified it was so difficult, 7% on everything. Mr. Mora's argument is really unique, Your Honor, because this is, and I've only been practicing 35 years, so I've got a few years that I need to practice longer. But in my 35 years of practice, I have never seen a case where throughout the entire case, counsel and his client argues that I get one thing, I get 2%. And then when the judge rules that, oh, by the way, I'm going to give you something else, he completely flip-flops in all his subsequent briefs and everything that he files and says, wait a minute, I get 7%. And if you note, if you look at what he attached, even to his brief, the caption says the 2% that my client's entitled to. He didn't even get around to changing the caption on the exhibit to say the 7% that the court was awarding. It still requests 2%. Now, granted, I mean, I was a young lawyer standing out in court in DuPage once. I remember the judge, and he was hammering on the other counsel, and I was a very young lawyer, and I thought I would add my 2 cents. And as I spoke up, the judge looked at me and he said, counsel, when the judge is leaning in your favor, shut up. Well, I can understand if counsel adopts that position after the court has already entered 7%. I mean, I guess I would change everything, too. But there is such a thing as called judicial estoppel. I mean, his position is absolutely clear as to what he's entitled to. He's entitled to 2% on an override if you find that's a contract. And I can appreciate Judge Barkowitz, as I've read his record, and the massive confusion that was presented to him trying to do his best to sort through it and come up with his decision. But respectfully, in that sense, I believe he came up with the wrong decision, and I don't think it even needs to be sent back to him. I think if this court is so exhibited, because that is a fact question, then I think you can turn around and say, it's 2% of the damages that he was able to prove. I've got the precise number in my brief. I believe it's $106,000. Judgment, $306,000, and everybody move on. Okay? Am I going to be disappointed with that? That may be a fair conclusion, given the confusion in this case. So I'm not going to say I'm totally disappointed, but I don't see how it goes any further than that. I don't see... So you see a basis for it, Judge? You don't agree with it, but you see how Judge Barkowitz calculated this $373,000 damage award? He took the actual numbers that were presented to him. By the plaintiff? Yes. He took 7% of that. That's correct. So if you divide that number by 7%, you get the gross number that he started with, and your contention is, take that gross number and multiply that by 2%. And although I disagree with Judge Barkowitz, that would have been the proper calculation that I disagree with. As I said, I think there's a lot of confusion here, but if this Court said, look, we're going to find it's a fact question as to what's attached to this contract, I can go back to my client and say, hey, that's a fact question, and frankly, I can see that's how the Court rules. But when I go back to my client, I want to be able to say, oh, by the way, though, your contract says 2%. Everybody agrees it's 2%. And it's 2% of whatever computed damages that they show. Now, I don't believe that after 11 years, it's 12 years, they have the right to go back now and say, wait a minute, we can speculate as to these damages. We want our own client, who is a little bit biased here, whose business was in the toilet and did an assignment for benefit of creditors just to get out of the personal guarantees to American National. I don't know if I want to rely upon him as the most accurate source of the volume of business, but clearly the records were there, and he had the burden of proof to go look at those records and compute it. And interestingly, in this case, as opposed to other cases, he had the right to turn to the defendants and say, you have to pay half because we've got an agreed order that you're going to pay half of that cost. And he didn't avail himself of that. So I don't know how you walk into a room when all the records are in the same order, they've always been kept. And keep in mind, there's no dispute the records were in the manner in which they were in the course of business. I don't know how you walk into a room like that and say, oh, that's just too many. I don't have to look at it. I mean, I did claims work on McCormick Place when they built the addition as a construction counsel. And in the course of those disputes, they sent me over to a room somewhere and said, there's the files. There had to be 50 to 100 boxes of banker boxes of files. And guess what? I spent weeks going through every single document. I just don't think that counsel has the right to come in here and say, that was too much work. We don't have to do that. Anything further? I'm just checking my notes. I don't... No, Your Honor, unless there are further questions, I think I've... Thank you, Your Honor. Let me take a moment to reply. First of all, the stuff about an assignment for the benefit of creditors has nothing to do with this. The closings were separate. The only documents that were in the room at the closing on the contract was the customer master listing, which the judge found was Exhibit A. And once he found it was Exhibit A, the employment contract is very clear in saying Mr. K gets paid on the, by the way, two years of customers that are contained in Exhibit A, which was the customer master list. It doesn't say some of the customers, or we'll talk about which customers are on that list. It says the customers, all of the customers listed on Exhibit A, Mr. K is to be paid a commission. So once the judge reached the factual determination that Exhibit A was the customer master list, that ended that discussion. That meant Mr. K was supposed to be paid commissions on all of those customers that came with him and that were sold by him or by Prolix. As to the comparison of the recitals to 7A and 7B, 7A and 7B meld with the recitals. 7A says Mr. K gets five percent in general when it's not his customers. 7B says he gets an additional two percent when it is his customers for a total of seven percent. That's essentially the same thing the recital says. There's two items. We go back to this question of what documents were available. The documents that were in the warehouse were not kept in the normal course of business. This was four years after, because of the time it took to get through pleading and discovery, by the time we got there, Prolix in essence no longer existed. These documents had been put in a warehouse, strewn on the floor, pieces of paper all over the place. Did you agree to an order where you and the defendant would agree to 50 percent of the cost of analyzing the documents? We agreed that we would look at that. Yes. And you didn't avail yourself? We did not, because it was too expensive. We did the research and it was for the amount of money at stake in this case it was going to cost, according to this isn't in the record, but we were told it would be approximately $100,000 to do that. And we didn't. And, unlike what counsel says, there is clear evidence in the record. And the judge heard it. When Ms. Jakubowski says, of course there were summary records. I have them there for them. They were in the warm room, in the file cabinets. They were there. When we went for this view, we weren't shown those documents. The only documents we were shown, and Mr. Kaye says this over and over again, was the paper strewn around the room. Nobody said, okay, now you've seen that, now come into the warm room and we'll show you the documents that are in the file drawers. Isn't that a factual issue the judge found? As a matter of fact, they weren't there, and he ruled that the documents, that the individual sales slips, or whatever, were there in the warmer course of business. It's a factual question. What are we supposed to do? He ruled, well, his ruling doesn't talk at all about the documents on the warehouse floor, or the documents that, it is uncontroverted, were in the warm room. He doesn't say those were there and these weren't. He made a finding, with regard to those documents. On what basis are we to not acknowledge that? He didn't make a finding on the availability of the documents in the warm office. So if he made no finding, and the record doesn't reflect what was to be done, why would the reviewing court be in a position better than he as to how to deal with the parties and their presentation of the evidence for resolution? The difficulty trial judges have is that they assume when the bell rings that the lawyers are ready, they say they're ready for trial, they're prepared for trial, they have their evidence, they have everything they want the judge to consider to win the day. And then the attorneys just can't come through with the evidence. And then the court is now supposed to figure out a way around all this stuff? The bottom line on this issue, Judge Pierce, is that we did put out evidence, very good, credible evidence, about what the sales were in the intermediate years, what the sales were in the outside years, and what the sales were in the intermediate years, by a person who had knowledge, very, very good knowledge, to not allow us to put that evidence in. We were allowed a offer of proof, but the judge rejected it entirely. He didn't say, I've looked at that evidence, I've heard it, and I think, well, I'm going to give him 30% of it. I'm going to give him... No. He refused to listen to it. It was good, solid, credible evidence, and whether those documents that were strewn on the floor, which were not in the ordinary course of business, were there or not, we should have been allowed that evidence. And it's a gross miscarriage of justice for us. It's just simply not fair for Mr. Kay. Once there's a ruling that he's entitled to commissions at 2% or 7%, again, I think 7% is the right number. And by the way, the confusion on that is very simple. He gets 7% for his direct sales based on 5.2, but he gets 7% based on the recitals for his indirect sales. But getting back to the credible testimony, it just simply is not fair that we ignore the fact that the court ruled that they withheld, he says, $373,000. If you decide it should have been 2% and it's $106,000, then he gets $106,000 for... Do you agree with that calculation? I agree with the calculation, not the theory of it. Right. But you would agree that Judge Barclay awarded 7%, which amounted to your judgment. Yes. However, if it should have been 2%, the correct number, the judgment correctly should have been $106,000, plus or minus... Give or take. I think that's the right number. Right. You don't agree with that statement? I don't. How it should have worked correctly, I think it's totally unfair not to award Mr. Kay commissions for the 34 months he was there and worked in which everybody agrees. But if we look at it, so you're saying the rule in Illinois is if a salesman, salesperson, doesn't want to look at the documents, the original documents that are made available, waits until a doctor may no longer, doesn't ask that anything be preserved by anyone, waits, that individual's testimony should take precedence in all cases. How would you differentiate this case so that in any case the salesperson can just say, I don't need to look at those documents. I know my sales were the year before or the year after. We know what they were a couple years after. My testimony is just as good. We don't need to look at those documents. Why don't we even have discovery then? So we can just have the testimony. The case law in Illinois is clear that all that matters is whether the individual's testimony is credible. The defendant could have used the documents and said, after we put in our offer of proof, the judge had not decided yet whether he was going to accept that into evidence. They could have used the documents and said, oh no, those were not what the sales were. We don't have to use them. Our evidence was good, solid, credible evidence. Had we spent the $100,000 to put all those pages together, would that have supported the oral testimony? I'm sure it would have. I've been very close. Just because those documents, which again, I tell you, were not in the ordinary course of business. We could have put them together probably for a very large cost. This was good testimony. It's not totally unfair, and there was no opposition to it by the defendant. They didn't get on the stand and say, hey, that's just not true. I'm the boss of this business, and none of those sales occurred. ...because there was no evidence to... No, during the trial, we'd been allowed to put in an offer of proof. The judge had not said at that point that he would not accept it into evidence. If I'm the defendant, and I think there's any reason for me to stand up and say so, we're not saying that he's entitled to a hundred percent, but we're saying that his evidence should be considered. It's not fair to say that he's not going to get three years, almost three years of work, which we say he's entitled to get, too. Let's not...whether it's fair or not, let's look at it a little differently. Was there testimony, and if there was, who testified as to the cost? Because what you're saying is the reason you didn't do it, and I can understand this, okay? The case may be worth anywhere from $100,000 to $300,000, okay? That's probably...or a little more, depending, okay? And you're going to spend... Of course, you could maybe ask the other side. I was going to pay half, but still, you said it could maybe, whatever, thousands of dollars. And that may not make a lot of sense for either person to spend all that money. Mr. Kay testified that it was too costly to do. Too costly, okay. But honestly, Your Honor, I'm not just trying to be stubborn. I don't really think it matters. I mean, I suppose it helps our position a little bit in a sort of equity way, but in the end, he should have been entitled to testify. He knew what was going on. He knew, within a certain range, what the sales were to all of those customers. They didn't suddenly go down from 2000 to 2001, and then go, you know, to nothing, and then go back up in 2002. We know what they were in 2000. And in 2020... If we accept that, for those of you... What would that amount be, approximately? Depends on whether you're talking about 7% or 2%. Well, let's... Okay. And where do we find that number? It's in our exhibit. We provide an average. The same exhibit that was used... I think it was 13, Your Honor. I'm sorry. I don't recall for sure. It might have been 12. But we did present as part of our offer proof, and we used an averaging of the sales that we knew that we had supported by the documents that we managed to find that were not produced by Prolix, and then we took that average and we put them into the years for which we did not have that kind of documentary support. And, that's all. That exhibit was supported by Mr. Kay's testimony that... But the number, the raw number for the missing 34 months is there in that exhibit. Yes. And you either take 7% or 2%. Yes. In that exhibit... In that exhibit it was based on 2%, because the judge had not ruled yet that we... Remember, at this point in the trial, we were arguing for 2%. Right. I readily admit that. So, the 2% number you have there, that's the number you're asking. If we rule in your favor the 34 months, I understand the 7%, but at the time of trial... If I were saying 2% were correct, the number you find on that exhibit is the number. I don't remember what the number is, but you can guess that it's about 2 1⁄2 times 106,000, because we're missing about 2 1⁄2 times of our work there. And, although I know you have a lot of things to do, but... That seems to me to be the right approach. Did the defendant contend that Mr. Kay was paid for those 36 months? No. No. He was paid, by the way. Of course he was paid his direct sales. That's not in dispute. For the whole time he was there, he worked for 5 years, he worked every day. When he made sales in those missing years to Jewell or Rawlings, he was paid. We never disputed that. They never disputed that either. Of course he was paid. Those 36 months we paid him. Whatever that number is, we paid him. You never got into that. You never got paid for those 36 months, and they never said he did or he didn't. Oh, yes. They said, oh, no. Ms. Jacobowski was very clear in saying in her testimony, we never paid him a dime on the indirect sales, ever. So, for the missing 36 months, her testimony was correct. We never paid him. Yes. And so, for the years that we had these summary documents, we proved that. And the judge awarded that. For the years we didn't have those sales in a documentary way, he would not hear our evidence on that and did not make his award on that basis. And that, to me, I think is just simply not fair. We earned it. All right.  Thank you, Your Honor.